## Case No. 9,194.

### The MARY ANN.

[Abb. Adm. 270;[1] 13 Betts, D. C. MS. 12.]

District Court, S. D. New York. April, 1848.

SEAMEN'S WAGES—ILLEGAL VOYAGE—KNOWLEDGE—RIGHT TO PREVENT CRIME—MERE SUSPICION—TAKING POSSESSION—RIGHT TO LEAVE.

1. It seems that seamen employed on board a vessel forfeited under the act of 1800, (2 Stat. 70,) as fitted out for the slave-trade, are entitled to wages, notwithstanding the forfeiture, if they were not knowingly or willingly connected with the criminal purpose of the voyage.

2. Seamen are authorized under the general maritime law to prevent or restrain their officers from the commission of open and flagrant crimes in the ship, attempted in the presence of the seamen.

3. But the crew are not justified, by circumstances affording reasonable ground of suspicion merely that the master is about to engage the vessel in the slave-trade, in taking possession of her at sea, or in a foreign port, and bringing her back to her home port; and their undertaking so to do, forfeits both the wages already earned and those for the residue of the voyage.
[See The Almatia, Case No. 254.]

4. The right of seamen to leave the vessel on the ground of her being chartered for a voyage in gross deviation from that for which they shipped, will not justify them in taking possession of the vessel while at sea.

5. Costs of a suit for seamen's wages imposed on libellants, where the crew had taken possession of the vessel while on her voyage and brought her home, under reasonable grounds of suspicion that she was to be engaged in the slave-trade.

A libel in rem was filed by James States, William Gray, Edward Davis, Thomas Holden, and Peter Johnson, crew of the schooner Mary Ann, against that vessel, to recover wages. There was also filed a libel in personam, by Peter Johnson alone, against William F. Martin, the owner of the schooner, to recover the same wages as were claimed by the libellants in the other suit. The facts

[1] [Reported by Abbott Brothers.]

in the case were, in brief, that the crew shipped on board the Mary Ann for a voyage to the coast of Africa. Arriving there, they became suspicious that the master intended to engage the vessel in the slave-trade. Resolving to prevent this, they took possession of the vessel, and after navigating her along the coast, in search of an American cruiser, under whose authority they might place her, but without success, they brought her back to the port of New York. Proceedings were taken in this court by the United States authorities, to procure the condemnation of the vessel as a slaver. The court decided that, upon the whole evidence, the charge was not sustained, but that there was probable cause for her arrest. The seamen having filed their libels, the causes were now argued upon the facts disclosed on the trial of the vessel.

The counsel in the personal action were—
Burr, Benedict & Beebe, for libellant.
J. M. Smith, Jr., for respondent.

The counsel in the action against the schooner were—
William Jay Haskett, for libellants.
J. M. Smith, Jr., for claimants.

BETTS, District Judge. These causes are connected in the argument with that of the United States against the same vessel, the final decree in which was rendered a few days since. The proofs presented in that cause form the basis of proceedings in the two cases under consideration.

The actions are by the crew of the vessel jointly against the schooner in rem, and by one of them separately against her owner in personam, to recover wages for the entire voyage to the coast of Africa and back to this port.

The schooner, on her return to this port, was delivered to the United States authorities, by the libellants, and was arrested upon a libel of information, in the name of the United States, charged with having been fitted out for the purpose of carrying on a traffic in slaves from one foreign country to another. Her forfeiture for that cause was demanded ·under the provisions of the act of congress of May 10, 1800 (2 Stat. 70), the offence being held by the supreme court to be embraced in the act of fitting out and preparing the vessel, with intent that she should be so engaged, although not actually employed in the business. U. .S. v. Morris, 14 Pet. [39 U. S.] 464.

Immediately on the seizure of the vessel by the United States, the seamen filed their joint libel against her for wages. This was on December 12, 1847; and on the 20th of the same month, the libellant Johnson commenced his separate action for the same cause against the respondent as owner.

The court decided, in the suit brought by the United States, that upon the whole evidence the libel was not sustained, and decreed the surrender of the vessel to her owner, but held that probable cause for her arrest on the charge preferred against her, had been established.

Had the prosecution on the part of the United States resulted in the condemnation of the vessel, the seamen would have been entitled to their wages notwithstanding the forfeiture, if it appeared that they were not knowingly or willingly connected with the criminal voyage. The case of The St. Jago de Cuba, 9 Wheat. [22 U. S.] 417, is directly in point to substantiate this principle.

The peculiarity of this case is, that the vessel was not condemned, nor was she brought in or diverted from her voyage by capture under authority of the United States. The seizers, if they may be so called, are not those who claimed the condemnation of the vessel for a violation of the acts in relation to the slave-trade, but they are the seamen composing her crew, who brought her off the coast of Africa clandestinely, and navigated her to this port, under apprehension that the master was about to employ the vessel and themselves in carrying slaves from Africa to Brazil.

The conduct of the crew is insisted, by their counsel, to have been justifiable and meritorious, because they acted bona fide under circumstances affording reasonable cause to believe that the master intended to engage the vessel immediately in the slave-trade, and in the full belief, on their part, that such was the fact. They accordingly had the right to withdraw themselves from connection with such a criminal enterprise, and did no more nor less than their duty in also saving to the owner his vessel, by putting it out of the power of the master to employ her in that felonious pursuit.

It is just to the crew to remark, in vindication of their good faith in the transaction, that they did not, under the influence of their alarm and apprehension, take the schooner immediately to the United States, but they honestly sought along the coast an American cruiser, in order to put themselves and the vessel under the protection and authority of the American flag, and to take the advice of an American officer in the emergency.

It is manifest, however, that though they might rightfully, under the circumstances, appeal to an American officer, the failure to find one could not be regarded as clothing them with an authority to act as they supposed he might have done in view of the facts. The interference with merchant vessels, by seizing them or altering their destination or employment, by public officers of high intelligence and responsibility, and free from personal bias or apprehension in the matter, is a most delicate power, the exercise of which is, by all free governments, placed under careful supervision and guarded by appropriate checks. No considerate jurisprudence would entrust such powers to common sailors, and permit them to act as umpire between the master and the owner, or the own-

er and the government. Nor would they on any account be authorized to assume the command of the vessel, or break up her voyage, or leave her master in a foreign port, on suspicion that the vessel was designed for illegal traffic, or even for a piratical expedition. Seamen are not a class of men whose prudence or discretion could be trusted with the exercise of such delicate and extraordinary powers. The utmost that has been allowed the crew by modern or ancient maritime codes is, to interpose by force, and restrain and prevent the officers in command from committing open and flagrant crimes in their presence, or through their agency. In such extreme case, they may refuse to obey an unlawful order, or even arrest and confine the officer who attempts to perpetrate a piracy or felony. U. S. v. Thompson [Case No. 16,492].

On this occasion, the crew, upon consultation, united in the determination to put or leave the master on shore, and carry off the vessel and endeavor to deliver her up to some American man-of-war upon the coast. Let it be admitted that a train of circumstances existed and had come to the knowledge of the crew, which afforded reasonable ground to suspect that the master contemplated employing the vessel in the transportation of slaves from Africa to Brazil, and that the liberty or lives of these men might become implicated by that attempt; still no act of guilt had been committed or avowed in their presence, nor do they show that an immediate interposition by them was necessary, or that abandoning the master on the coast, and going off with the vessel, was requisite for their protection and safety, or that that course was adopted to secure the rights of the owner, supposing that he was ignorant of the wrongful purpose of the master.

The vessel lay close into Gallinas, a place of resort for American, English, and French cruisers stationed on the coast to detect and prevent the prosecution of the slave-trade. An English vessel of war was then at anchor directly in the vicinity of the schooner, and if the crew could not find safe shelter on shore, they could at once have placed the ship and themselves under the guard of that ship, and there is no reason to doubt that on application to the British commander, and showing him probable cause for the proceeding, he would have extended his protection to them until some proper American authority could be communicated with. No imminent necessity accordingly is found for taking off the schooner by the libellants, even if it had been placed beyond question that she intended to take on board a slave cargo the next day. It is not shown that the libellants applied to the English vessel for protection; and that their flight was regarded as needless and suspicious by the commander of that ship, would appear from his sending his cutter, at the request of the captain of the schooner, in pursuit of her, to bring her back to Gallinas by force.

I do not, however, determine this point on the supposition that the libellants gave way to a groundless alarm. Admitting that there was probable foundation for their fears, there is no sound and safe principle of the maritime law which justifies their extraordinary determination to remove the schooner from her moorings, and the still more reprehensible one of breaking up her voyage and running her across the Atlantic to the United States, in charge of men of no known capacity for such an undertaking. She would lose the protection of her insurance; and the peril of actual loss of the vessel, on a voyage so conducted, would scarcely be less than that of abandoning her on the coast to enter upon a piratical trade. The subjection of the vessel and cargo to the arbitrament of the crew, as to the legality or propriety of such an adventure, would expose distant mercantile operations to uncertainties and perils of the most appalling character; and it can never be expected that the right of a crew to interfere at their discretion, and take forcible possession of a vessel on mere circumstances of suspicion against the master, can be countenanced by the courts as a general principle of law. Their interposition to that end must always be limited to extreme cases, where the facts are palpable, and leave no room to doubt that such interference had become indispensable to the safety of their own lives, or at least to avert the commission of some heinous crime.

The case then demands, not only that the conduct of the crew in running off with the vessel and bringing her to the United States should be pronounced excusable under the circumstances, but that it be held meritorious to such a degree as to entitle them to maintain an action in rem against the vessel, or in personam against the owner, to enforce payment of full wages during the whole period that she was so controlled by them and diverted from her voyage. This claim must be pronounced incompatible with every sound and safe principle of law.

If this branch of the case cannot be supported, it is contended that there is an equity in behalf of the crew, sanctioning their claim to wages on the outward voyage. That was faithfully performed, and the cargo safely landed at Gallinas.

This demand is supposed to be sustainable on either of two grounds—First, that the crew have given sufficient evidence that the vessel had deviated from her voyage, and was about to be employed in the slave-trade, to justify them in abandoning her service; second, that the act of the master in chartering her from Gallinas to Bahia, was a deviation which released the crew from their contract, and empowerd them to recover wages for the services already rendered.

1. The conduct of the master, at Gallinas, wore a very mysterious and suspicious appearance. The voyage stated upon the shipping articles was "from New York to one or more ports on the coast of Africa, and back to her

port of discharge, in the United States." The evidence, on the part of the owner, showed that the voyage was intended for purposes of traffic up and down the coast, according to the usage of the trade on the western coast of Africa. The period that it was to continue was not stipulated in the agreement, or stated in his letter of instructions; and without admitting that this omission imported an understanding between the owner and master, that the latter was expected to do something else with the vessel than to run her upon the voyage proposed, there is no question that, if he protracted the services of the seamen along the coast to an unreasonable extent, they might, for that cause, leave the vessel at a suitable time and place. Abb. Shipp. 60S; The Crusader, [Case No. 3,456]. The crew were not under his absolute power as to the direction of their services; much less could this indefiniteness as to the continuance of their engagement be used by the master to put them on a service wholly foreign to that agreed upon, and it would be, moreover, occasion for serious distrust as to his purposes, on their part. The chartering the vessel by the master to transport passengers to Bahia, without consulting his crew, and without stipulation as to the period she was to be employed on her destination after the charter-party should expire, taken in connection with the preparations before ordered by him on board of the vessel, and the notorious courses employed in carrying on the slave-trade, were all calculated to awaken their alarm. Had the men refused to perform that voyage, or left the ship to avoid being forced to make it, the court would, without doubt, have held that the circumstances fully excused the act, and that they were entitled to wages to that period.

2. Whatever question might be raised upon the first point, it is, however, most clear that they had a right to abandon the vessel, on the ground of her being chartered for a voyage in manifest and unreasonable deviation from that for which they shipped. The law on this point is precise and well settled. Cases to the point are collected, and the principles well stated in the elementary books. Curt. Merch. Seam. 24, 25; Abb. Shipp. 173, note 1.

But these doctrines, looking to the protection and indemnity of seamen in vindicating their rights under the shipping contract, give no countenance to the inference now sought to be deduced from them, that a crew may exercise that right of withdrawing from the contract, by also taking away with them the vessel in which they engaged to serve. Such a consequence has no legitimate connection with the right itself, or the means necessary to its exercise. It is a naked aggression upon the rights of the owner—certainly no less when committed in port, where the men could find protection from coercion and personal violence, than at sea—and it will hardly be claimed that a crew may arrest the master and ship at sea, and take command of her, to avoid a deviation from the voyage contracted. The authorities justify them in refusing, when in port, to perform service or remain on board after the vessel has deviated from her voyage (U. S. v. Mathews [Case No. 15,742]), but in no case is it intimated that they have the power to redress themselves for a past deviation, or to prevent an anticipated one, by seizing the vessel abroad and carrying her back to her home port.

This act of the crew was illegal. In an action by the owner against them for compensation because of the loss and injury occasioned to him thereby, they could not defend themselves on a plea of necessity, or on the ground of prudent precaution. They were entitled to leave the ship and abandon their engagement, or to defend themselves, in the harbor, from any attempt by force to compel them to go on the voyage to Brazil. Their privilege extended no further; and if, instead of furnishing grounds for strongly suspecting that the master was preparing to pervert the shipping engagement into a slave voyage, they had proved the fact explicitly, they would have no right in such case to do more than abandon the vessel. The ignorance and inexperience of the men, the suggestions made to them by others exciting or increasing their apprehensions, and the peculiar situation in which they were placed, tend to exonerate them from all mutinous or improper motives in what was done. They no doubt thought they were acting for the best interests of the owner, and in maintenance of the laws of their country; but most clearly these matters were not within their competency to determine, and in a civil action it is no justification for an illegal act that the party committed it with rightful and commendable intentions.

If fully persuaded that the libellants acted from worthy motives, and in the belief that what they did was for the benefit of the owner, yet the court could not countenance so glaring a dereliction of duty on the part of sailors, by permitting them to recover wages against the ship or owner, on facts and circumstances such as are disclosed in this case. If there was reasonable ground to apprehend danger to themselves, personally, in remaining on board and remonstrating with the master against his proposed voyage, and refusing to perform it, it was their duty to leave the vessel; and on such a termination of the engagement they would have recovered, certainly, the wages earned on the outward voyage, and probably, also, satisfaction for the return voyage thus lost. By absconding with the vessel and bringing her to the United States, from the coast of Africa, they have been guilty of a violation of their duty to the ship and to the owner, and deprived themselves of all rightful claim to wages for any portion of the time they were connected with her.

The libellants having been each examined as a witness in the cause, have had the oppor-

tunity of disclosing every fact and circumstance within their personal knowledge conducing to prove a guilty purpose on the part of the master of the vessel, or in excuse or extenuation of their imputations against him, and of their own conduct. They were not able, however, to present particulars which, reasonably considered, could establish the criminality of the master's conduct, or justify the determination adopted by them, and the means they took to carry it into effect.

Yet, upon the consideration that they acted under the influence of terror, and not from insubordination or dishonest motives, I should feel inclined to regard that state of excitement as so far palliating the conduct of the seamen as to warrant a decree leaving them to pay their own costs alone, without further punishing them, by imposing on them the costs of the owners; and if they possessed means which could be appropriated by the process of the court to the satisfaction of the costs created under these prosecutions, I should forbear giving authority to use it against them.

2 [In pronouncing the opinion as first prepared, this view of the case was presented, and it was stated that such inclination would have prevailed if the crew had limited themselves to their suit in rem, prosecuted in connection with the seizure of the vessel by the government.

[But it was suggested that such favorable view of the case was overweighed by the act of the crew in commencing severally actions in personam against the owner, for their wages, and by different proctors, subsequent to the suit in rem, when no necessity existed for multiplication of actions and accumulation of costs, and the decree against the libellants for costs was placed substantially upon these reasons. Before the decree was entered it was pointed out to me by the counsel for the libellants, that only one of the crew had instituted a suit in personam, and that this was done before the return of the process in rem, and without the knowledge of his proctors that his name had been connected in fact with that suit.

[I have re-examined the original files and find I was mistaken in both these particulars. The first libel was filed the 11th or 12th of December, and the suit in personam was commenced the 20th, by the cook and steward alone: the other seamen having brought no action, against the owner. I have accordingly reconsidered the subject of costs to determine whether under the case first supposed and now found substantially to be its true position, the decree for costs ought to be revoked or modified.

[If the seamen had given stipulations for costs, or if discharging the order for costs against them would also absolve their proctors from liability to disburse the costs of prosecution created by the libellants, I should

2 [From 13 Betts, D. C. MS. 12.]

consider the condition in which the crew were placed at Gallinas, and their fright and unpremeditated departure with the vessel as reasonable grounds for adhering to my first impression, and for relieving their sureties and proctors, from paying these costs.] 2

It is manifest that there is no equity in the case justifying the court in imposing costs upon the owner, who has sustained wrong and serious loss by the proceeding of the crew, and that the costs created in their behalf, in their own suit, must justly fall upon them. Their proctors, moreover, would derive no relief from a decree which only exonerated the libellants from paying costs to the claimant and respondent; and there being no sureties to protect it, it becomes, in the disposition of final costs, merely a naked question of equity between the seamen and the owner. The judgment of the court upon the merits has determined that the owner was clear of all culpability in the matter, and that there was not proof sufficient to fasten guilt upon the master. It results, that the right of the suit is on the part of the owner, and the mistake and the wrong on the part of the sailors, and that accordingly they should be subjected to bear at least their own costs.

Independent of that consideration, it seems to me that the owner can properly claim the award of costs against the libellants, as a protection and immunity against subsequent suits on their part. It is by no means clear that a decree merely dismissing the libel would bar after actions by any of these parties; but if there is connected with the order an award to the owner of his costs of suit, there would be a positive judgment for the amount rendered against them, and no tribunal would permit the cause of action to be again litigated until that judgment was satisfied. I shall, therefore, decree, that the action in rem and that in personam against the owner be dismissed, with costs to be taxed.